The Honorable, the judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Good morning. Please be seated. We're happy to hear argument in our first case, number 154019, United States v. McDonnell. Counsel, Mr. Francisco, before you begin, I want to reiterate that we've been very generous with the time, both in the briefs and in the oral argument, and we expect you all to honor that generosity by directly answering the questions and acceding to the speed limits that we've set up, speed limits, time limits. All right, with that in mind, Mr. Francisco. Thank you, Your Honor. Judge Motz, may it please the Court, Noel Francisco for Governor Bob McDonnell. Under the government's broad theory, if Governor McDonnell simply set up a meeting, answered a question, or indeed even posed for a photograph with Johnny Williams without asking anyone to do anything specific, he committed a crime. As our broad and unprecedented group of amicus briefs make clear, no one ever thought that that was the law. And if it were true, it would give prosecutors broad license to pick and choose their targets from amongst virtually every elected official in America. The district court then compounded that error through a series of rulings that uniformly cut against the governor, including refusing to ask prospective jurors the most basic question, have you formed an opinion about the governor's guilt or innocence based on your exposure to pretrial publicity, by refusing to sever his wife's trial so that she could testify on his behalf, and by even refusing to allow the governor to explain to the jury the full scope of Johnny Williams' unprecedented triple immunity agreement. Mr. Francisco. Yes, Your Honor. Is the jury instruction your most important argument? Is the voir dire your most important argument? I want to be sure we get to what you regard as your most persuasive argument. Yes, Your Honor. Our most important argument is the official act argument, which encompasses both a sufficiency challenge and a sentencing challenge. Our second most important issue, which I'd also like to get to, is the issue of pretrial publicity. Turning to the official act question, which goes to the heart of our case, in order to engage in official action, a government official must make or pressure someone else to make a specific decision on behalf of the bride pair. The line is between access on the one hand and advocating for a specific decision on the other. Here, Governor McDonnell never crossed that line, and the jury was never even told that that line or any other line even existed. Take, for example, the health care leader's reception, one of the charged official acts. It was nothing more than a cocktail party at which no business was discussed, no decisions were made. That can't possibly be an official act. The same with respect to the meeting with Ms. Hufstetler. As Ms. Hufstetler repeatedly testified in this case, other than attending the meeting, Governor McDonnell never asked her to do anything, which is why she felt completely empowered as soon as that meeting was over.  Attorney, what I'm interested in is what the jury instruction was that you wanted, how it was a correct statement of the law, how it was not substantially covered, and then third, how it was so important that the failure to give it needs to be reversed. Yes, Your Honor. The jury instruction that we requested is at page 753 of the joint appendix. We believe what that jury instruction did and what the instruction that was charged did not do was that it explained- That's your instruction on official act? Yes, Your Honor. Explained what official acts were and it explained what official acts were not. Here, the key flaw in the instructions that the court actually gave was that they swept in both lawful and unlawful conduct because the district courts instructed the jury that in official acts- Well, the government might say it has to be looked at in context to find out, figure out whether it's lawful or unlawful. And I would completely agree with that, Your Honor, and in the context of this case- Context of the facts. Yes, Your Honor. What's going on? And here we have to look at them, as you know, in the light most favorable to the government. Yes, when it comes- Because they prevailed with the jury. Yes, when it comes to evaluating whether our sufficiency challenge is correct. No, when it comes to evaluating whether the instructions were a reversible error. On the instructions, yes, you do need to take- And we would submit that here, even taking it in the light most favorable to the government, none of the governor's conduct crosses the line. On the instructions, here, even in context, these instructions were fatally overbroad because they instructed the jury that virtually anything that a government official does in his official capacity, including every step towards achieving an end, constitutes official governmental action. If I could give you- No, that's not quite right because even in the beginning of your instructions, the act has to be on a question or matter or cause pending before the official. Yes, Your Honor, and as the Supreme Court made clear- So it has to have that- there always has to be that connection. Yes, Your Honor, except the Supreme Court made clear in Sundiamon that when you quote the statute, that's insufficient when you go on to give it an expansive gloss. Well, yes, if you do give it an expansive gloss, and it seems to me that your instruction on 753 did precisely that. It gave it an expansive gloss. I don't think so at all, Your Honor, because our instruction has a series of limitations, all of which the district court rejected. Here, the district court told the jury that the instruction encompassed all settled practices, including every step towards achieving an end. I thought it said could. Well, no, Your Honor.  But even if you thought it's- There were a series of things that you object to that the district court instructed. It could include this. It could include that. And as I- I thought I understood your argument that was that there wasn't any countervailing instruction that it didn't include this. Sure. Is that the gist of your argument, or is it not? Tell me. Yes, Your Honor, it's both of those arguments. We're making both of those arguments. First of all, if you just take the instruction on its face, it's facially overbroad. It's very much like the instruction that the First Circuit gave in the Ercioli case. In Ercioli, Judge Boudin explained that the official act definition was not on its face objectionable. On its face, it was similar to other instructions that had been given. Why? The reason it was objectionable in that case was because it also swept in potentially lawful conduct. That's precisely what happens here. As the government accurately argued to the jury in this case, under these instructions, an official act could encompass something as innocuous as a photo op. That's because every step towards achieving an end is defined as an official act. But the district court compounded that separate error by refusing to give any limitation on its otherwise all-encompassing instruction, including limits that are drawn straight out of this court's cases like, straight out of the Jefferson case, the fact, and I'm quoting from our instruction, the fact that an activity is a routine activity or a settled practice of an officeholder does not alone make it an official act. Obviously correct, but the district court refused to impose any limit on its otherwise all-encompassing instruction. Or here's another one that we proposed. Merely arranging a meeting, attending an event, hosting a reception, or making a speech are not standing alone official acts, even if they are settled practices of the official. That's based on Sun Diamond, Citizens United, and comes out of the instruction that Judge Huvail gave in the Ring case, or this one. Mere ingratiation and access are not corruption. Word for word out of the Supreme Court's decision in Citizens United. The district court even refused to give a standard goodwill gift instruction. We proposed, quote, a gift or payment given with the generalized hope of some unspecified future benefit is not a bribe. Word for word out of Jennings. Here, one of our principal arguments was that the governor believed that Johnny Williams was giving goodwill gifts  that comes with hobnobbing around with important government officials. Your defense here was good faith. That was your defense. That was one of our defenses, Your Honor. That's what you said to the judge at the charge conference. You said our defense, our crucial defense, he called it, is good faith. And you got a good faith instruction. We did, Your Honor. And which said, I couldn't say it could be any better. It said that if the governor acted in good faith, he didn't have criminal intent, and there could be no crime. There would be no crime. I don't know how it could be any better for him. Because, Your Honor, if the jury doesn't understand the true scope of official acts, and the jury doesn't understand the difference between a goodwill gift, a permissible goodwill gift, and a prohibited bribe. But from the governor's standpoint, if he acted in good faith, it doesn't make any difference about any of that. That's not right, Your Honor. Well, it is right, because that's the way the instruction was. If he acted in good faith, then he couldn't have criminal intent, and there would be no crime. I think that if the jury believes— That's what you argued to the jury. You closed the closing argument. That was one of our— I know, but you closed it off. You closed the argument off after getting the instruction. You closed it off by saying, he acted in good faith, and you quoted the instruction. There'd be no crime. And that's because— No criminal intent. Right, and that's because after every jury instruction that we requested cut against us, that's all that we were left with to argue was good faith. Once the court— So you were seriously impaired in your ability to conduct your defense as a result of not giving the goodwill jury instruction. Absolutely, Your Honor. And did the government in its closing—I know that you just said you withheld or weren't able to make some of the arguments you had planned to, given the jury instructions. Did the government's closing argument take advantage of the failure to give the instruction out of Jennings that you wanted? It took the loophole and drove a Mack truck through it, Your Honor. The government repeatedly argued to the jury that everything is innocuous as posing for a photo opportunity or simply arranging a meeting without anything more. All of those things constituted official governmental action. It goes to the core of our argument. I think that no reasonable jury can conclude that Governor McDonnell violated the law. But even if you were to disagree with me on that, it's altogether possible that the jury did agree with us on the facts. But under these instructions, the jury still would have been required to, or at the very least authorized to, convict. Because everything as innocuous as simply hosting a cocktail party, simply suggesting a meeting without requesting anything happen at that meeting, as Ms. Hufster testified to, simply asking your in-house lawyer to see you about an issue, another one of the official acts. Under the instructions the district court gave, the jury was required, or at least authorized, to conclude that those were prohibited official acts. And that is clearly reversible error for the same reason as an urchioli, for the same reason as a rabbit. Two closely analogous cases that, if anything, have facts far worse than this one. Remember, the government's theory here was that there was no express agreement. It conceded that in its closing argument. No express agreement. Likewise, Johnny Williams, notwithstanding his triple immunity, would only testify to an implicit agreement that the governor would provide some form of unspecified help. Clearly not enough under the law, and fits within a classic goodwill gift. That's why the government's theory all along was that you could infer a corrupt agreement from a pattern of gifts and loans on the one hand, and a pattern of official acts on the other. Well, if there were no official acts, then there's no pattern from which you can infer a corrupt agreement. And here, none of Governor McDonald's conduct crossed that line, and the jury was never even told that that line or any other line even existed. Well, the jury was told that a line existed by the quote of the statute to begin with. And that you began your closing argument with that quote. So the term official action means any decision or action on any question, matter, cause, suit, proceeding, or controversy which may at any time be pending. In other words, if there isn't something pending that the person who is giving the benefits to the public official, if there's nothing pending upon which he's giving the benefits, then there is no crime. It's true. But if there is, then that makes it a crime under the statute. Two responses, Your Honor. I would submit that the four of us could sit here and argue over the meaning of those words until the cows come home. But to expect a jury to figure out what those words mean is, I think, implausible. Which is why the instruction immediately after quoting that statute says, official action as I have just defined it includes those actions that have been clearly established by settled practice as part of the public official's official position. So it's telling the jury what I just told you, this is what it means. Right. And then it goes on to say that includes every step towards achieving an end. Which is why the government could accurately argue that something as innocuous as a photo op was included. Notwithstanding that it defined official act to at least potentially include everything under the sun, it refused every conceivable limit on that otherwise all-encompassing instruction. Now, going back to the issue about whether the statute alone, in quoting the statute alone was sufficient, it clearly wasn't here. Since as an urchioli, it was defined broadly enough to allow the court to find perfectly lawful conduct was swept within its ambit. And here, I think if you properly instructed the jury in the line between axis on the one hand and advocating for a specific decision on the other, nothing would qualify. Now, I think Sun Diamond also answers your pending issue, Your Honor. Sun Diamond makes crystal clear that when the Secretary of Agriculture gives a speech to farmers on USDA policy, even though he clearly has issues of USDA policy pending before him, that's not an official action. And if I could offer you another example. That wasn't the statute, was it? That's the gratuity statute. Yes, Your Honor. And the same definition of official act applies here, which underscores. We talked about that in the Jefferson case. You think maybe Jefferson's wrong. No, Your Honor, not at all. I think Jefferson didn't address this issue. Here, the line is between axis on the one hand and advocating for a specific decision on the other. Jefferson was clearly advocating for a specific decision on behalf of the bribe payer. The line was irrelevant in Jefferson. It goes to the heart of our case here. The jury was never even told that it existed, and Governor McDonald's conduct didn't cross it. But, Judge Motz, if I could offer you another example. Suppose Johnny Williams asked the governor, Governor, who should I talk to about getting studies for a natto block? And Governor McDonald answered that question. Well, that's in Secretary Bill Hazel's bailiwick. You ought to talk to him. And I'll give him a call for you. Excuse me? And I will give him a call. Well, Your Honor. Or arrange a meeting for you. But even without that part of the hypothetical, it's still an official act under this jury instruction and the government's definition. Simply answering a question. That's the reason why the government's instruction is fatally overbroad. It clearly sweeps in lawful conduct. Now, I would submit that if you take the next step and say, and by the way, I'll arrange for you a meeting, that likewise doesn't cross the line. Because if it did, you really would be opening the net for federal prosecutors to pick and choose their targets amongst virtually every elected official in America. Now, remember, the official act definition is not limited to quid pro quo bribery. It also applies in the gratuities context. The very same definition. That means that if a wealthy donor makes a campaign donation or maybe a donation to a charitable foundation, after getting an important meeting at, say, for example, the State Department, both the donor and the recipient of the donor are on the hook for a federal gratuities prosecution. Nobody has ever thought that that was the case. I have a question about these instructions that you've directed us to. Did you have an argument in front of the trial court about these instructions? Absolutely, Your Honor. Yes. And is that transcribed somewhere? Yes, it's in the charging conference. The way the charging conference unfolded is that we had a series of objections that applied to a broad array of instructions. With the court's permission, I laid out our objections once, and then as we went through and we got to different points in the argument where it raised the same objection, I asked the court, would you like to repeat what I said at the beginning? Did you offer the court a lesser included part? Because I don't know that it's worth us discussing here, but I don't think the instruction on 58, that all of it is in fact the law. So was there any discussion about putting part of it in? The first two paragraphs basically are covered by the instructions. Yes, Your Honor, there was. That's not a problem. So it's just the last paragraph. That was at page 7342 of the appendix where we requested the following. Providing mere credibility or reputational benefit to another is not an official act. To find an official act, the questions you must decide are both whether the charged conduct constitutes a settled practice and whether that conduct was intended to or did, in fact, influence a specific official decision the government actually makes. We likewise propose. Excuse me. I'm on 753. Yes. What part of 753 was sort of your ultimate fallback position with the district court? Or was any part of it? Did you just say all or nothing? No, no, that was our fallback. What we said, I think it was 753. Okay, well, maybe if you can help me with 753 since there are lots of volumes here. Oh, I'm sorry, Your Honor. You're looking at the proposed instructions. Yes, that is what I'm looking at. The charging conference. I understand. But the charging conference, at least every charging conference I've ever been to, there is sometimes some give and take. Exactly. And what I was asking you is in the charging conference, was there any give and take? Did you say, all right, well, maybe some of these sentences are not required by the law? Yes. At least is my view as we sit here. Right. So which ones did you think were required? So what we did at the charging conference is we reduced it to two specific requests. And this is at pages 7340. So you changed it at the charging conference? No, no. 753 is not what you are. No. What I made clear at the charging conference is that first we wanted our proposed instruction. Right. That was our request. As an alternative, we requested that the court give two additional instructions at pages 7340 and pages 7341 of the appendix. And I can read it to you, Your Honor, or I can. Okay. Does it track this language in 753? Not verbatim. What it does is it tries to pick out its core. It tries to pick out its core. All right. So, Your Honor, I think that it's quite clear here that as in Sundiamond, as in Skilling, as in Urchioli, as in the Rabbit case, the district court plainly gave an all-encompassing instruction that swept in both lawful and unlawful activity. And I'd like to focus on one last point here before turning to pretrial publicity. And it's that our proposed instructions, both in the instruction itself and at the charging conference, were clearly correct statements of law that went to the heart of our case. But even if you disagreed with that, just looking at an instruction on its face, and we clearly objected to that instruction on its face as being facially overbroad. And that instruction is facially overbroad for precisely the same reason that the instruction in Urchioli was facially overbroad, because it allowed the court to conclude or allowed the jury to conclude that lawful conduct, like merely setting up a meeting or merely hosting reception, constituted a settled practice of governors and was a step towards achieving an end, and therefore was an official act, just like simply answering a question, who should I talk to about a nano block, or simply posing for a photo op, as the government argued to the jury, was an official act. Given that this went to the very heart of our case, it was incumbent upon the court, as this court said in the United States against Arthur case, to instruct the jury in the clearest possible terms on what the lines of distinction were. By refusing to do that, by likewise refusing to give a standard goodwill gift instruction, the district court violated that principle, and the jury was permitted to convict, even if it completely agreed with us as to what the facts of this case showed. Now, I'm happy to answer any further questions the court has on this issue. All of this, of course, all of what we've been talking about assumes that we had a fair and impartial jury. Here, however, we don't even know that we had that. This was one of the highest profile criminal prosecutions in Virginia history. Well, as I understand it, both sides wanted this elaborate questionnaire, correct? Yes, Your Honor. And there was give and take about what questions would be on the questionnaire? Not really. We jointly submitted a written questionnaire to the court. Both of us agreed to it. That sounds like it. Yeah, yeah. Oh, sure, beforehand. That questionnaire, importantly, included the question, have you formed an opinion about the defendant's guilt or innocence based on your exposure to pretrial visit? And all the prospective jurors filled it out. Yes, Your Honor, but inexplicably, the district court, when he sent the juried questionnaire out to the jurors, he struck that question. So the jurors were not asked, have you formed an opinion based on your exposure to pretrial publicity? Were there any questions about pretrial publicity? There were questions on whether you have been exposed to it, and then there was one question about opinions. Have you expressed an opinion to someone else based on your exposure to pretrial publicity? As we all know, there are plenty of people, maybe not in this courtroom, but there are plenty of people who hold opinions but don't feel the need to express them, which is precisely why we in the government agreed that the jurors should be asked, have you formed an opinion? Okay, then you made the argument. They filled out the questionnaires. Some jurors were struck. You got a group of jurors there, and you all said, no, we need this question. Absolutely, Your Honor. And so the judge said, what's your problem? And he said, well, there are these eight jurors or some number of jurors, and they came up, and they were asked the question that you wanted to ask. Isn't that right? No, Your Honor. May I explain? Yes, but your time is running out. You only named the eight. You named the eight, and then you stopped. If I could explain. When we got to the hearing. Judge Bencher says you sort of waived it. And he's clearly wrong. When we got to the hearing, we specifically said for those jurors exposed to publicity, they need to be questioned to determine whether they formed an opinion. Handed up the questionnaire. Page 1690 of the transcript, he said, no, I'm not asking this question. Right. You have to make a determination based on the questionnaire that we have. That's when he conducted his en masse stand up, sit down proceedings. Stand up if you heard. Everyone stood. And what happened? Then we objected a third time. Everybody sat down when he asked the question. Right. Then we objected a third time. And we said, Your Honor, we can't trust the credibility. So three times rebut. Then, Your Honor, and this is what I think you're getting at. At page 1692 of the appendix, Mr. Aspel, the defense attorney, made clear that he was calling up those who had answered yes to the question whether somebody had expressed an opinion. The only thing we were allowed to ask. And that's, Judge King, where we called up the eight jurors. What happened next is highly instructive. Because we called up those jurors that had answered yes to the question, have you expressed an opinion. And on the very first one, we were actually mistaken. The government's attorney pointed that out to Judge Spencer and said, Judge Spencer, actually that first juror they called up has not said yes to the question, has he expressed an opinion. He answered no. And here's what Judge Spencer said. And I'm quoting from page 1696 of the transcript. I'm sorry, ma'am. We thought there was something in your questionnaire. So you may have a seat. It is crystal clear that at every stage of these proceedings, from submitting the written questionnaire to showing up at the hearing to objecting at the hearing. To the end of the questioning of, okay, seven jurors. Then what happened at the end? Didn't the district court say to your counsel, to your side, do you have any more? And the response was not on pretrial publicity. Yes, Your Honor, but that's because he had already ruled that we could not question individual jurors. It's very difficult to be a trial lawyer. Much, much easier to be on appeal. I couldn't agree with that one. But you have to keep making the objection. And we made it three times, Your Honor. And with all due respect, not making it a fourth cannot possibly constitute a waiver. The one thing I'd also point out is that waiver is a legal issue subject to Danover review. And I do not think you can credibly read this transcript and conclude that we waived it when we asked for it in the written questionnaire, inexplicably struck. And the government asked for it in the written questionnaire as well? Yes, Your Honor. We asked for it at the voir dire hearing, and the government actually agreed at the beginning that the jury ought to be questioned on this. The district court then again said no. Here's what Mr. Askell said. My position is that if somebody is exposed to pretrial publicity, they have to be individually voir dired, and I have a list of questions. We handed them up. Here's what Judge Spencer said. You're going to have to identify specifically the people that you think should be struck for cause, and the court will make an assessment based on the information that we have on not asking these questions, not aware of a case anywhere. But then he did ask questions of the individuals that you brought to his attention. Only the individuals that the court permitted us to bring up, which were not by definition. Did he say you could only bring up eight? He said you could only bring up those who had answered other questions beyond mere exposure to pretrial publicity because we specifically said we want to be able to question every juror based on their mere exposure to pretrial publicity. So when they stood up that they had been exposed to pretrial publicity, you wanted to question each of those, and the court would not permit you to do so. Is that what you're saying? Yes, Your Honor. The court only permitted you to do seven, and those are the seven that said they had expressed an opinion. Exactly, Your Honor. You tried. Exactly, Your Honor. And in between there, the judge said to the people standing up, if you can give him a fair trial, sit down. Yes, Your Honor. Precisely the procedure the Supreme Court rejected in Irwin against Dowd when it said, and I'll close on this unless the court has further questions, no doubt each juror was sincere when he said that he would be fair and impartial to the petitioner, but psychological impact requiring such a declaration before one's fellows is often his father. Who amongst us would answer the question no when asked if you can be fair and impartial? That's precisely why individual voir dire is required. Thank you very much. Thank you, Your Honor. We'll hear from the government. May it please the Court. Your Honor, I'd like briefly to pick up right where the argument left off on a point about the pretrial publicity and the voir dire. When the district court said after doing the collective questioning that defense counsel could bring up jurors that they wanted to individually question, the court did not limit in any way the defendant to just asking about the question of whether somebody had expressed an opinion. And I think if you read the transcript when the court started doing the individual questioning of jurors, you will see that the defense counsel was citing a variety of reasons for why they wanted to question somebody. And there wasn't a point where they offered a reason to question somebody and that the court said, no, I'm not going to let you ask a question of this juror about that, that that's not a sufficient basis. I think the fair reading of the record is what the court was doing was say, give me a reason and I will question a juror when you give me a reason. But we're not going to sit here and just automatically question every single one of these jurors. How many prospective jurors were sitting out there, 150 or something? There were 142, I believe. Well, I'm sorry. No, go ahead. So are you saying that the defense never said, I'd like to question all of the prospective jurors who were exposed to pretrial publicity and the court said, no, you can't do that? Because that's what opposing counsel just said. The way I would put it is the court said, give me a particular to the juror reason, but didn't say, you know, look, you can only call up people who said they expressed an opinion. It didn't tie it to the questionnaire. Right. No, I mean, I think that he was looking for a reason out of the questionnaire, but there were 99 questions in that questionnaire, and you could bring up, they brought up, you know, exposure to press, expressed an opinion, a variety of bases for individual questioning. And then at the very end he said, do you have anyone else? And they said not on pretrial publicity. It did say that, but I think my colleague is asking you a question before, what happened before that. Maybe try one more time. Well, did the government ever object to the defense asking jurors about their exposure to pretrial publicity? Right. What happened is first there was. So no, the government never objected to that? What we said was we think. You said the court should ask about that in the questionnaire, right? Right. There was a questionnaire where we requested a question about have you formed an opinion. The court did not, the district court did not include that question, but there were a variety of other questions that covered that. Then at the hearing when defense counsel wanted to question every single juror, we said how about as an intermediate step that you question everyone who said that they had followed the case very closely or somewhat closely. And the district court said, well, I'm not going to do that. I'm going to do something in my own way. So every single juror stood up when asked the question, have you seen any pretrial publicity about the case? Right. Is that what happened? Right. Every juror. That's correct. And then the court asked two questions, said first, if you have read, heard, or seen something in the media, I want you to stand up for me. Then the court said, based on what you have heard, read, or seen relating to this case, if you are in your mind able to put aside whatever it is that you've heard, listen to the evidence in this case, and be fair to both sides, then I want you to sit down. And that's appendix page 963. And everybody sat down. Did you suggest this stand-up, sit-down process to the court? No. That was what the court said. Okay. Now, the question that I think that we have, or at least I have from what the opposing counsel said, was that after there had been this stand-up, sit-down, they said, no, we want to have an individual voir dire of each one of these 145 people to discuss pretrial publicity. Is that what happened? Right. And the district court said no. Right. And what did the district court say? No, but, because eight people came up to the bench. Right. So how did that happen? They said, we want to question everybody. Then we proposed an intermediate step of the people who had said they had followed the case very closely or somewhat closely. And then the district judge, hearing that, said, and we said, look, we don't think that's required, but out of an abundance of caution, that would be a better route to go in our view. And the court said, well, you know what, I'm not going to do that. I'm going to do something of my own devising. And his own devising was, defense counsel, give me a reason. You've got, I mean, in terms, this is Mike Lawson, what he's saying to them. He's saying, you've got a very fulsome questionnaire. Give me a reason for why you want somebody brought up here. They offered up a variety of reasons, and they cited them in the transcript. If you read, you'll see. Right. Not just pretrial publicity, but a variety of reasons. Or not just the expressed an opinion question out of the questionnaire. Right. And then the judge questioned a series of people, and at the end of it they said, we don't have anyone else on pretrial publicity. Did they ask questions on other things after that? There were further voir dire questions. The last part of voir dire was not just pretrial publicity, so there were some additional voir dire questions. At your position, we review all that for abuse of discretion? Yes, that's right. And in this Court's cases in Baker and Bailey, the Court has said that collective questioning is permitted, and both of those cases involved collective questioning where there wasn't, the defendant hadn't gotten what he wanted on a questionnaire. So here this case has the added benefit that the twofold, that the parties were armed with very extensive questionnaires, and then that the Court said, give me a reason, and I will question further somebody, and they did that. And then they got to the end of it, and the Court said, anything else? And they said no. Can we turn to the jury instructions? Sure. Okay. And I would like to focus, to begin with, Juan, on the instruction that I think that defense counsel has focused on as the key problem here, which is his proposed jury instruction number 58 on official act. And where is it again? And that's on Joint Appendix 753. And that instruction is just erroneous because what it says. Their proposal is erroneous, that's what you're saying? Right. That's why I probed him on their ultimate, I think some of it is erroneous, on their fallback position. So maybe you can discuss that. Sure. The fallback position, which they are. First, I guess let me set the table. So tell me what you think is erroneous. The first two paragraphs aren't erroneous, right? No, we don't take issue with those, but they. And the district court basically gave those. Right, right. It's once you get into this third paragraph that you start having error where they suggest that a government official's decisions on, you know, whether to attend an event or whether to attend a meeting or respond to a phone call are not decisions on matters pending before the government. And so they're suggesting that a meeting can never be an official act. And that's clearly wrong. Jefferson involved plenty of meetings that this court concluded were official acts. What about the next sentence? Because they're explaining why they think that's so, and then they say this is because mere ingratiation and access are not corruption. Right. Would that instruction, mere ingratiation and access are not corruption, would that have been error? I mean, I don't think that the Supreme Court. The short answer is no, but I don't think that the Supreme Court in writing that in Citizens United was meaning to provide a definition formally for bribery law. And what I think it captures is the notion that if you lack an agreement. He's talking about campaign finance. Right. And if you lack an agreement with corrupt intent to exchange things of value for official acts, then you've gone beyond ingratiation and access. A bribery agreement is more than ingratiation and access. Did they ask for an instruction that just included that sentence in addition to the first two paragraphs? I don't believe so. And what he's pointed to. They only asked for it in the context in which it's presented here. Is that what you're saying? No. I don't think you are saying that, are you? No. What I'm saying is there's this official action instruction that specifically has it. Now, today he's pointed to, starting on joint appendix page 7340, a fallback position that says to convict the defendant, the official must receive the payment in exchange for performing or promising to perform some specific official act. That takes out the course of conduct provision. And then he says a gift or payment given with the generalized hope of some unspecified benefit is not a bribe. That is a way, I suppose, of saying ingratiation and access. But we had good instructions on the requirement. It's the correct statement of the law based on Jennings, right? It's word for word out of Jennings, what you just read. A gift or payment given with the generalized hope of some unspecified future benefit is not a bribe. So that's a correct statement of the law, right? Yeah. So where is that substantially covered in the rest of the jury instructions, that concept? That concept is covered in two ways. One is there is a good, essentially, I think, unchallenged instruction on the requirement of an agreement. What you have is both through conspiracy and then you have the overarching quid pro quo instruction, and that's Appendix 7669, which says the official must receive the item of value correctly in return for being influenced in the performance of any official act. And then you have the good faith instruction, which, as Judge King pointed out, they labeled their critical defense, and that's at Appendix 7360 at the charge conference. And the good faith instruction captures this notion that if you're receiving the gifts without an agreement, if you're receiving the gifts in good faith, then you are not guilty of a crime. And so that point is substantially covered by the lack of agreement in the good faith. And that provided them with ample basis to make that argument. Mr. Cook, I'll tell you what I would like you to address. It looks to me like the honest services instruction that was given is correct as far as it goes. Right. But it talks about things that could be crimes, and it doesn't say anything that is not a crime. And that is, I think, the gist of what the appellant's argument is here. And maybe you can address that for me. First of all, I think that's a fair characterization. It doesn't say all these things are crimes, but it says they can be crimes,  Right. Well, I think there's several points I would make in response to that. The first is that the key point is the court begins by saying that the term official action means any decision or action on any question, matter, cause, suit proceeding. And so it has limited there, like, look, this is the ultimate standard for an official act. You have to meet that. And as the court was pointing out, they began their closing by emphasizing those very restrictions. Well, it seems to me that if the court had repeated that sentence, sort of every other sentence, that that might have done, that would have made the charge more even, if you will. And that's what I, you think that one mention of that, or you had several points, so maybe tell me about your other points. Right. Well, the other points are that you've got considerable discretion in choosing the specific wording of an instruction from the district court, and you have cases like Patterson where this court has said that, you know, although a more specific instruction might have been desirable to the defendant, the district court didn't abuse its discretion in choosing the particular wording. There's also the principle that, as this court has said, often let the counsel argue factually in terms of a legal standard rather than making, having the judge make counsel's arguments for them. And there's the broader point, too, that when what happens is you have offered to the judge a large collection of instructions that the judge correctly concludes are wrong. Then you have a long charge conference where a bunch of proposals are submitted to the judge, specifically that are either have their own flaws again or are things substantially covered. At some point the judge isn't responsible for coming up with good proposals. Well, I think that's, you know, that makes sort of a modicum of sense. Do you have a case that says that? Well, you know, I mean, ultimately it would be. And the judge didn't have to come up with a good proposal here because the defense had already done that based on the law. Well, they come up with the proposals that were erroneous or that didn't train on the point that they are now suggesting. I mean, here's another way to put the point is that they have proposed and continue to propose a series of restrictions on official action that are just wrong. So they keep going back to something like a formal executive process, voting on bills, granting contracts. That's wrong under Jefferson and Birdsall. They have a, you've got to have some sort of policy setting, you know, authority at stake. And that, of course, excludes a host of what lower level employees in government do, and more the case about the prison officials or prison guards taking bribes is a good example of that. They're not out there setting policy. They have arguments about the things the government provides, which in Jefferson, this court said, look, a benefit that a foreign government in Nigeria, for example, is going to confer counts. And so here, in contrast, we have these studies that clearly. Can you give me the site again to where the good faith instruction is located? Sure, that's at Joint Appendix 7692. Is that the instruction that was actually given? Yes. Okay, thank you. And the point where they said that's our critical defense is. Yeah, I found that part. Okay. Thank you. They also have said categorically that meetings and events are never official acts, and that's not true. They've also suggested that you have to accomplish the goal of the bribe payment, and that is definitely not true under cases like Evans and Brewster that have said fulfillment of the quid pro quo. Well, you have to have a corrupt agreement. Right. And so what you have is them offering a whole lot of instructions that are wrong, and the judge repeatedly saying, no, I'm not going there. And ultimately, when a district court is exercising discretion and choosing instructions, it doesn't have to come up with the more reasonable intermediate step that is never offered to them. Well, that's why I was trying to talk about the charge conference, which I don't remember hearing much about in the papers, but there are lots of papers, so maybe it was there somewhere, and whether they had come up as their fallback position with something that did not contain error. And when you were sort of ticking off these things, I think you were looking at the proposed jury instruction number 58, which is the J753, and not the charge conference, or maybe you can tell me. Well, I'm relying principally on what they're arguing now on appeal. They're brief. At the charge conference, I mean, they've now directed your attention to 7340, and for that, I think it's covered by, you know, that concept was available. What they raised on 7340 is already covered? Yeah, and it's available to them. When I was a prosecutor a long time ago, we used to construe Rule 32 to require objections to be made after the instructions were given to the jury, but prior to the deliberations beginning. Right. That would boil them down. The judge would send the jury out, and he would then hear specific objections to the instructions as given. Sometimes judges get up there and wing it a little bit, and then he would, after it was over with, he or she would tell the jury that they could start deliberating or bring them back in and give them some more instructions, and we always thought Rule 32D required that, but you all didn't do anything about that. You just restructured them and sent them out to deliberate. Did nobody ever raise that kind of question in this district? No, Your Honor is exactly right. I think for courts in this country, they're required to be done that way, say that Rule 32D requires that in order to preserve the points, because then they've boiled it down to what Judge Moss is getting at. You're not at proposed instructions. You're at the end of the line. What would improve it? What do you want now? Right, and the rule Your Honor is describing has a lot of sense insofar as what it does is it says after the judge has actually read the instructions to the jury, that's the point where you have to register an objection so that the judge knows. That's what the rule says. Yeah, right. If you don't preserve it, it specifically says that if you don't do it that way and you raise something on appeal, it's ruled for plain error. It's assessed for plain error. Well, did they raise it then? After the court read the instructions? Yes. No, there was no objection. Did you make the objection? No. On appeal? Nobody said a word. There you go. Neither side said anything. You know, in fairness, this is a point that at the charge conference. No, but we'd have a better record. Yes. On appeal if things were done that way. At the charge conference. Whether it's been preserved or not here. I'm not getting into that right now. And I thought that before the judge or after the judge instructed, before the jury deliberated, I thought that defense counsel did say something like, well, you know, we have our objections. I mean, at some point there he did say we have our objections, and we talked about them already. That was before the instructions were given. Yes, I think it was. The judge says I've been over there several times with you all. Right. And he may have been getting impatient with you. Right, and he told them your objections are preserved. He did. Which is why, you know. He did. But then he instructed them, and we don't know whether he actually instructed them word for word. We assume he did. Sometimes, as I say, I've had them wing him a little bit. Sure. Well, and that's why we listen very closely. Right. You remember when your colleague was arguing, he was talking about Judge Bodine's case. Right. Maybe you can address that for me. Sure. And in that case you didn't have, I mean, one of the key points, I think, from that case, is that you did not have the 201A3 definition provided to the jury. You had something that was really broad, where official action was defined in terms of under the cloak of office, which does not have the limitations here. And so Ursioli is a case in which you just had straightforward instructional error because you didn't capture the requirements of official action. I thought that the piece that he read to us aloud, and I can't find the case right now because there's so much stuff, the court said something like defining reading just the statutory definition is not enough. No? I don't believe that's in Ursioli. I may be mistaken about that, but that's not my memory of the case. Okay. I mean, I think that the key point here is that it did not use a definition that fits the statutory language. And I would say the other thing, you know, not everything in Ursioli is something that we agree with, and part of the problem is that not only did you have an instruction that didn't track the definition, but the court's analysis didn't really stay tethered to that language either, which, you know, in this court's opinion at Jefferson, it was tied directly to that statutory definition. And that's the way to go, and that's how you analyze this case, and that's why I think Jefferson is a much more helpful case to the court than Ursioli is ultimately, is because of it. You say nothing that Jefferson is circuit precedent. That's exactly right. That's exactly right. That was out of your district, wasn't it? It was indeed. You say that this case is stronger than Jefferson in your brief, I think, because it involves an executive rather than a legislator? That's right. There are several respects in which I think Jefferson is a stronger case. I mean, admittedly, the conduct there involves a lot more money, and, you know, Jefferson ended up with a longer sentence, and so there are important ways in which what Jefferson. There's both more quit and more quo in Jefferson, so how is this a stronger case? But, yeah, it's in the sense of the definition of official act and what was promised there. Here, in this case, what you have is ultimately, you know, what Johnny Williams wanted was state-funded research studies of an out-of-block and coverage in the state employee medical plan, and that is more squarely within the realm of what governments do than the various trade and, you know, the various business ventures in Africa that were at stake in the Jefferson case. So in that respect, you've got something that's much more core to what the U.S. government is doing. And then, secondly, what you have is the influence that is being exerted here and the official act that is being taken on the matters are all directed at a chief executive's subordinate employees. Jefferson was essentially lobbying these foreign government officials over whom he had pretty limited powers. I mean, they want to, you know, they want the United States government to be friendly to them, but it's a different matter when you have someone like, you know, Clore or Lazo, the doctors at these state universities, getting the, you know, the governor of the state saying that this is a good thing. I mean, that's just a very more direct, when a highest government official I'm sorry, but before you finish, I do want to ask you one question about the goodwill instruction that they offered that was taken out of Jennings. Did the government object to that? You know, honestly, I I mean, it's a correct statement of the law. Right, I'm trying to think. In the context of I'm going to get help here. So their proposal on 7340 still had this specific official action requirement, which read out, in our view, the course of conduct scenario, because Jennings said both were true. Like you could have an agreement for a specific official act or you could have this course of conduct theory, which is what we had here. It was included in that the government. Right. Found it objectionable. Exactly. But there may have been some follow up back and forth that perhaps we'll hear about. Sure. I mean, if what they had been offering was just the goodwill gift, you know, I don't know that we would have objected, but what they were offering was a proposal that got rid of the course of conduct theory that has been repeatedly upheld by this court and in Jefferson and in Jennings. Both. Well, they certainly argued gifts. That's true, too. I mean, they they no doubt about that. Right. Right. It's the argument. Right. But I mean, at some point, we don't have to offer for their proposed instructions for them. I mean, they made multiple tries with errors in them. And they have to offer legally correct instruction. Exactly. You know, this case strikes me as one where there is this is not an earth shattering observation, but that there was a lot of quid proven. And there's not even really much appellate argument about that. And but the quo is much thinner. Now, does government propose that we can sort of look at these in balance? And if we have a very strong quick case, we don't need as much quo. Well, I would say about that, that the nature of the payment of the payments has evidentiary force in the sense that when you see somebody getting $177,000 worth of payments in cash and luxury goods and that sort of thing, that that's informative about people's motivations and what they're doing. Now, you still need to meet. You don't have to have the official acts performed, but there has to be an agreed upon official act. I mean, so you've got to meet the test. Do you have five official acts? Sure. I mean, we've got five actions on. What if it just had been the first one? I mean, it would have been a difficult case, but that would suffice. You know, whether the government would have persuaded the jury that there really was an agreement here without good faith and corrupt intent and intent to fraud, you know, I'm not sure whether we would have secured a conviction. Or bought the case. Right. But when you have, you know, a two-year pattern of conduct and the timing evidence in this case is just, you know, I think devastating for the defendant. You've got him going on the vacation at Williams' Smith Mountain Lake vacation home. He drives the Ferrari home. That, you know, drive home, he lies about it, saying there was no recreational use. And, of course, there was. And then 90 minutes after getting home in the Ferrari, he's sending an e-mail to Bill Hazel, who is a guy that thinks that Johnny Williams has got a lot of junk and refers to him as the Tic Tac Man, says, you know, send a deputy in the morning to meet at the mansion on the planned studies of a NADA block at UVA and MCV. And Bill Hazel, despite his views, the next morning, you know, says right away, will do. And official goes. And so, you know, and again, when you go to the winter, when he's trying, the defendant's trying to negotiate a new loan with Williams, he sends first the e-mail to Williams asking for, you know, the additional money and where he says, do you want me to call your lawyers on the certificates and the documents? That was a reference to their earlier phone call about getting an additional loan. And six minutes later, he wrote to Ike saying, please see me about the NADA block issues at UVA and VCU when, you know, just several weeks earlier, the first lady had written to the governor and Jason Ike saying, you know, about the NADA being clinical studies at UVA and VCU. She said, here's the info from Johnny. He has calls in to VCU and UVA and no one will return his calls. And then the first lady follows up and says that. I think your time has expired. Remember, you can finish your sentence. Sure. The point is the timing evidence showed an agreement robustly in this case. Thank you very much. Appreciate your argument. Thank you, Your Honors. Just a few brief points. First, a technically accurate instruction, even assuming this one were technically accurate, can be misleading by omission. That's precisely what the first circuit held in Erchioli, and I'd point the court to page 295 of that decision, where it said the cloak of office phrase is not inherently a novel or objectionable way of describing purportedly official action. But in this setting, it permitted the jury to readily consider as potentially criminal conduct both, and then it describes the conduct that was not potentially criminal. Did the trial court there give the beginning, cite the statute, explain the statute to the jury or not? No, Your Honor. But remember, the first circuit's decision there wasn't turning on the instruction. It was turning on whether the conduct alleged was even an official act. And what the court held was that because the instruction could encompass lawful action, it didn't. And here, if you instruct the jury, as Your Honor was saying, that official action potentially includes everything under the sun, when it in fact does not potentially include everything under the sun, you at the very least have to tell them what it doesn't include. So I understand. This is a fuzzy area. It's an area where there's some black that's clearly official action, some white that's clearly not official action, and some gray. Here, the district court only instructed on the black, didn't instruct on any of the white or any of the gray. It gave you the good faith instruction, which wrapped it all up. It said if good faith, there's no criminal intent and there's no crime. If he does it in good faith, there's no crime. Your Honor, and if good faith is what sees them. And you proved, didn't you, buddy, in all the character witnesses to testify to his good character that he was honest, that he could be believed. You mean he gave you a lot of leeway on that? And that's got an instruction that character evidence alone is enough to prove that he acted in good faith. And if good faith is what saves this, it truly does open up virtually every elected official. You all characterize it as a crucial defense, and I agree with you. Because we had nothing left. If good faith is what saves it, then you truly have, given that official acts also applies to gratuities, given prosecutors broad license to haul in elected officials. Your statement that it was your crucial defense came during the jury charge conference, though, right? And that's what I'd like to turn to next, Your Honor, which is the instructions that we proposed were plainly correct, both in the jury conference and in the proposed instructions. I'd like to address the government's claim that they were wrong. First, the government says that we categorically excluded meetings. That is unambiguously false. If you look at page 753 of the joint appendix, this is our proposed instruction, not at the jury conference, but written. Merely arranging a meeting, attending an event, hosting a reception, or making a speech are not standing alone official acts, even if they are settled practices of the official. A government official's decision on who to invite, whether to attend, or whether to attend is not an official act because mere ingratiation and access are not corruption. We're not saying anything about meetings categorically being excluded. Judge Thacker, if you turn to the instructions that we proposed at the charging conference, which are pages 7340 and 7341, focusing on the one from page 7340 to 7341, that is word for word out of this court's opinion in Jennings. They claim that somehow it's misleading because it doesn't refer to the specific course of action language. Well, what they failed to tell you is that they requested a specific instruction on that, and Judge Spencer said no, presumably because, as Jennings makes clear, there's no difference between a specific type of official act and a specific course of official action. Jennings uses the terms interchangeably because a specific course of interaction is just more than one instance of a specific type of official action. The instruction that we requested there, though, is word for word out of Jennings, the one that goes from page 7340 to 7341 and includes the goodwill gift instruction. Likewise, the next instruction that we proposed on page 7341, that in providing mere credibility or reputational benefit to another is not an official act. Defined an official act, the questions you must decide are both whether the charge conduct constitutes a settled practice and whether the conduct was intended to or did, in fact, influence a specific official decision the government actually makes. Another clearly correct instruction. No, no, no, but the government doesn't actually have to give you anything. I mean, that's the... No, but it has to influence a decision that was within the government's power, straight out of the D.C. Circuit's decision in Valdez. So the first paragraph is out of Jennings, but that second paragraph is something else altogether. Well, and they were two separate limitations that we proposed. First the one, then the other. Finally, Your Honor, going to pretrial publicity, if you look at the transcript, it is crystal clear that we specifically said we want to be able to question any juror that was exposed to publicity. And the court said no. That's why in the portion of the transcript, remember what the district court did was it went issue by issue, and there was a section of the hearing where we were talking about pretrial publicity. That's where he repeatedly said we couldn't question anybody simply because of their exposure. Instead, conducted his stand-up, sit-down proceeding, and then allowed us to call forward only witnesses who raised issues other than their mere exposure to publicity. We were not allowed to question just because they were exposed to publicity. Judge Thackett, you may remember the Bailey case. I think you were the assistant United States attorney on that case. Even in Bailey, they asked the jury, have you formed an opinion based on your exposure to pretrial publicity? We were denied that basic question. So to this day, we have no idea whether any of those 12 jurors that sat in that box and convicted stepped into that box having formed an opinion against the governor based on their exposure. Your Honor, you've been very patient. Governor McDonald is a longstanding public servant. He committed no crimes here. We respectfully request that the conviction be reversed. Thank you very much. We appreciate the argument both counsel and the very good papers on the case. We'd like to come down and greet the various lawyers in this case, and then we'll take a short recess. And when we take the recess, anyone who doesn't want to hear our second, third, and fourth cases can leave. Thank you very much. This court will take a brief recess.
judges: Diana Gribbon Motz, Robert B. King, Stephanie D. Thacker